## UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Andrea Place, | : |
| | : |
| Plaintiff, | : |
| | : Case No. 2:21-cv-00985 |
| v. | : |
| | : Judge Michael H. Watson |
| Warren Local School District Board | : |
| of Education, et al., | : Magistrate Judge Kimberly A. Jolson |
| | : |
| Defendants. | : |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now come Defendants Warren Local School District Board of Education and Amy (Way) Colgrove (hereinafter collectively referred to as "Defendants"), by and through the undersigned counsel, and pursuant to Fed.R.Civ.P. 56, move this Court for an Order granting summary judgment in their favor.  There is no genuine issue of material fact, and Defendants are entitled to summary judgment as a matter of law.  The reasons in support of this Motion are more fully set forth in the attached Memorandum in Support.

Respectfully submitted,

/s/ Michael Valentine
Michael J. Valentine, Esq. (0038806)
Keona R. Padgett, Esq. (0090628)
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
(614) 228-1311; FAX (614) 232-2410
mvalentine@reminger.com
kpadgett@reminger.com
*Attorneys for Defendants* W*arren Local School District Board of Education and Amy (Way) Colgrove, individually and as Head Coach of Girls' Basketball at Warren Local High School*

## MEMORANDUM IN SUPPORT

### I.     PRELIMINARY STATEMENT

Plaintiff Andrea Place ("Andrea") and her parents were upset with her role on the Warren High School girls' varsity basketball team when she was a sophomore.  Specifically, they thought she should be playing and starting more.  Andrea was injured at the end of her sophomore basketball season, and she was unable to play basketball on the school's team during her junior year due to her injury.  She tried out for the Warren High School girls' varsity basketball team her senior year but did not make the team for several reasons, none of which had to do with Andrea's complaints or her parents' complaints.  As a result of not making the team, she has filed a lawsuit in federal court against the Warren Local School District Board of Education (hereinafter the "District") and her basketball coach, Amy Way[1] (hereinafter "Coach Way").  At its most basic level, the question at issue in this case is whether federal courts are or should be the arbiters of coaching decisions at the high school level.  They are not, nor should they be.  The claims against Defendants fail for multiple reasons, and because all of Andrea's claims fail, Defendants are entitled to summary judgment.

### II.     STATEMENT OF FACTS[2]

**A.  Andrea's sophomore basketball season was a rebuilding year for the Warren High School girls' varsity basketball team, and despite Andrea's performance and ranking on the team, she played for the sixth highest number of minutes.**

During the 2018 to 2019 school year, Andrea was a sophomore at Warren High School.  (A. Place Dep. 82:9-12; Compl. ¶ 3).  That year, Andrea tried out for and made the Warren High School girls' varsity basketball team.  (Compl. ¶ 3).  The year before Andrea's sophomore year, the Warren High School girls' varsity team lost eight varsity members.  (Way Dep. 116:18-19, 202:6-10; Harold Dep. 308:7-13).  Of those eight varsity players, five of them were the starting five players and one of

---

[1] Coach Way was incorrectly named in the Complaint as Amy (Way) Colgrove.
[2] For the purposes of this Motion for Summary Judgment, and only for the purposes of this Motion, Defendants will treat Andrea's testimony as true and accurate, but they reserve the right to later dispute and refute this testimony.

them was the first one off the bench.  (Way Dep. 116:19-21).  After losing so many of the varsity players, the following year was a rebuilding year, and not many of the girls on the varsity team had any varsity experience.  (Way Dep. 202:17-20).  The varsity team was mostly made up of the junior varsity team from the year before, including Andrea.  (Way Dep. 202:21-22; Compl. ¶ 3).  If the varsity team had not lost the eight players from the year before, including the starting five, then Andrea would not have made the varsity team her sophomore year.  (Way Dep. 202:11-14).  Rather, she would have been on the junior varsity team again that year.  (Way Dep. 202:15-16).

Because the varsity team was very young and inexperienced, Coach Way was trying to find a fit, figure out the players' roles, and get them to work together at the varsity speed and level.  (Way Dep. 116:21-23, 202:22-23).  Deciding who to start and who to play on the team is dependent on the players' skill level and how the team plays together, and this can change over the course of a season.  (Way Dep. 117:1-3).  It is also dependent on the matchups and who the team is playing.  (Way Dep. 117:6-8).  According to the scorebook for the 2018 to 2019 girls' varsity basketball season, Andrea started ten games.  (Way Aff. ¶ 8, attached as Exhibit A).  Admittedly, she started more games earlier in the season, but she was also out due to an injury for the last three and a half games of the season, which means she missed three additional potential games to start.  (Way Aff. ¶ 8; Way Dep. 116:8-10).  There were a few girls on the team whose playing time changed for them over the course of the season.  (Way Dep. 116:11-15).  Andrea started the season doing well and giving effort, but as the season progressed, some of the other girls on the team were playing better, and the team was playing better with them.  (Way Dep. 116:18-117:3).  As this happened, some of the early starters, including Andrea, stopped starting as many games.  (Way Dep. 117:3-5).  Despite this, there were only five girls on the team who started more games than Andrea, three of whom started twenty games and two of whom started eleven games, such that Andrea started for the third highest number of games.  (Way Aff. ¶ 8).

Additionally, Andrea played during fifty-seven quarters that season. (Way Aff. ¶ 7). Again, she was out due to her injury for the last three and a half games, so she missed fourteen additional potential quarters that she could have played had she not been injured. (Way Aff. ¶ 7). There were seven players on the team who played more quarters than Andrea. (Way Aff. ¶ 7). Perhaps more illustrative of her time on the court that year, Andrea averaged sixteen minutes per game. (Way Aff. ¶ 9; A. Place Dep. Exh. 2). There were only five girls on the team who averaged more minutes per game than Andrea, and these averages ranged from twenty minutes per game to twenty-seven minutes per game. (Way Aff. ¶ 9; A. Place Dep. Exh. 2). Up until she was injured during a game on February 4, 2019, Andrea played in every game that season. (A. Place Dep. 98:10-13).

Not only did Coach Way testify that Andrea's role on the team changed over the course of the season due to how she was performing compared to her teammates, but Andrea's statistics for the season objectively support that decision. When making decisions about who to play during a game, Coach Way considers multiple factors, including the opposing team and how well the players have been playing. (Way Aff. ¶ 10). For the guards, like Andrea, Coach Way would consider several statistics in making decisions about who to play, including the players' statistics for shooting, assists, turnovers, and steals. (Way Aff. ¶ 10). During the 2018 to 2019 season, Andrea's field goal percentage for shots made out of all field goal attempts (two and three pointers combined) was 26.6 percent. (Way Aff. ¶ 11; A. Place Dep. Exh. 2; A. Place Dep. 102:7-13). This ranked her eleventh on the team. (Way Aff. ¶ 11; A. Place Dep. Exh. 2). Her field goal percentage for two pointers was 34.0 percent, which ranked her ninth on the team. (Way Aff. ¶ 11; A. Place Dep. Exh. 2; A. Place Dep. 101:4-13). Her field goal percentage for three pointers was 5.9 percent, which ranked her ninth on the team. (Way Aff. ¶ 11; A. Place Dep. Exh. 2; A. Place Dep. 101:14-21). During the season, Andrea scored fifty-four total points. (Way Aff. ¶ 6). There were seven players who scored more points than Andrea. (Way Aff. ¶ 6).

4

Andrea's performance in other areas also placed her in the bottom half of the team. Andrea averaged 0.67 assists per game, which ranked her seventh on the team. (Way Aff. ¶ 12; A. Place Dep. Exhs. 1, 2). She averaged 1.87 turnovers per game, which was the fifth highest number of turnovers among the players on the team. (Way Aff. ¶ 12; A. Place Dep. Exhs. 1, 2). Andrea averaged 2.33 rebounds per game, which ranked her seventh on the team. (Way Aff. ¶ 13; A. Place Dep. Exhs. 1, 2). The one key statistic that did not put her in the bottom half of the team was her average number of steals per game; she averaged 1.3 steals per game, which ranked her third on the team. (Way Aff. ¶ 13; A. Place Dep. Exhs. 1, 2). In short, based on Andrea's statistics, she ranked in the lower half of the team, but she had the sixth highest playing minutes and third highest number of games she started. (Way Dep. 201:20-202:4; Way Aff. ¶¶ 8, 9; A. Place Dep. Exhs. 1, 2).

## B. During Andrea's sophomore basketball season, the complaints by the Places were about Andrea's role on the girls' varsity basketball team.

The complaints that Andrea and her parents had during the 2018 to 2019 basketball season were complaints about Andrea's playing time and the number of games she was starting. According to Andrea, she had concerns about her playing time[3] during sophomore year and, as she described it, "the treatment versus playing time and that involves playing time." (A. Place Dep. 102:17-24, 103:1-104:8). She noticed the decrease in her playing time around the same time that she was not starting as much as she had been, and she had concerns about why her playing time had changed. (A. Place Dep. 103:1-21, 104:2-3, 116:3-7). This change in her playing time happened midway through the season—at the end of December or early January. (A. Place Dep. 105:19-106:4). There were also other players on the team who were not playing a lot at that point. (A. Place Dep. 110:7-10).

According to Andrea, she first talked to Coach Way shortly *after* she had been removed from

---

[3] By playing time, Andrea means both the overall time she was playing during the games and whether or not she was starting the games. (A. Place Dep. 103:10-104:8, 115:18-21). Based on Andrea's own definition, any reference to "playing time" in this Motion is meant to include both the overall time Andrea was playing during the games and whether or not she was starting the games.

the starting five.  (A. Place Dep. 31:11-23, 115:22-116:2).  When she talked to Coach Way, Andrea was looking for guidance on what she could do to better her playing time, and she asked Coach Way what she could do to get back to being a starter.  (A. Place Dep. 31:11-23, 32:5-9).  During this conversation, they talked about both the amount of time she was playing during the games and starting.  (A. Place Dep. 116:8-20).  This was the only conversation Andrea had with Coach Way about starting.  (A. Place Dep. 111:1-18).  Her other interactions with Coach Way were related to typical interactions with a coach during practices and games, such as guidance on playing, expectations, and what the coach wanted her to do differently.  (A. Place Dep. 111:4-18).

Andrea's father, Eddie Place ("Eddie"), also made complaints to Coach Way about Andrea's playing time.  Andrea's parents were aware that she was not getting much playing time, and they expressed their concerns about her playing time to Andrea.  (A. Place Dep. 134:20-135:2).  Her parents were not happy with her playing time.  (A. Place Dep. 135:3-24, 139:2-7).  When Andrea would discuss basketball with her parents, the main concern or complaint her parents expressed with her had to do with her playing time.  (A. Place Dep. 137:4-8).  Andrea was aware that at some point, her father started making complaints about her playing time.  (A. Place Dep. 134:15-19).  The first time Eddie talked to Coach Way about Andrea's playing time was after the Meigs game.  (Way Dep. 57:8-21).  The Meigs game was the second regular season game that year on November 29, 2018.  (A. Place Dep. Exh. 1).  That game, Andrea played nine minutes.[4]  (A. Place Dep. Exh. 1).  Coach Way explained to Eddie that she played who she thought would give them the best chance of winning the game.  (Way Dep. 58:2-6).  Other than that, Eddie did not talk to Coach Way about Andrea's playing time until January 23, 2019.  (Harold Dep. 210:9-25; Harold Dep. Exh. NN).  He texted Coach Way about Andrea's playing time again on January 26, 2019.  (Harold Dep. 211:1-16; Harold Dep.

---

[4] There were only three other games that season that Andrea played fewer minutes than this November 29, 2018 game. (A. Place Dep. Exh. 1).

Exh. NN).  In other words, besides the second game of the regular season, Eddie did not reach out to Coach Way to complain about Andrea's playing time until after Andrea had talked to Coach Way, which was after her playing time had decreased and she was not starting as much as she had been. The timing of these complaints is particularly important.  Presumably, if Coach Way was making her decisions about Andrea's playing time because of Andrea's complaints or her parents' complaints, then their complaints would have happened first and then her playing time would have gone down, not vice versa.  Obviously, the changes had already happened when they started complaining, or they would not have been complaining about a change or decrease in Andrea's playing time.

The only other complaint that Andrea had about Coach Way during her sophomore year was related to communication.[5]  (A. Place Dep. 102:21-24, 106:5-107:20, 124:20-125:21, 126:2-13, 145:7-11).  Part of this complaint was not about Andrea specifically, and part of this complaint was contradicted by Andrea's own testimony.  First, Andrea claimed that it was hard to have a conversation with Coach Way and that Coach Way was negative in her feedback.  (A. Place Dep. 37:1, 126:2-13, 128:20-129:3).  Andrea claimed that this was not just an issue with her but with others on the team, too.  (A. Place Dep. 129:11-19, 130:6-131:2, 198:1-3).  As an example of the negative communication, Andrea referenced a time in the locker room when Coach Way supposedly told the team—not Andrea specifically—that there were no D-1 or D-2 athletes in the locker room.  (A. Place Dep. 129:4-13).  There was another time that Coach Way went around the locker room and told each girl on the team what they needed to work on and/or what they did well.  (A. Place Dep. 147:14-148:6).  Additionally, Andrea claimed that these communication-related concerns were concerns of hers from the beginning of her sophomore year.  (A. Place Dep. 127:14-23, 128:15-19).  In fact, the first time Andrea claimed she noticed it was at the parent student meeting that occurred before tryouts

---

[5] According to her own testimony, Andrea considered the bullying and harassment to be comments about her ability to play basketball, her not playing, and Coach Way not wanting to talk to her.  (A. Place Dep. 145:2-14).

her sophomore year. (A. Place Dep. 131:7-132:15). Again, the comment that shocked her—that Coach Way was not their mother or friend—was not made to Andrea specifically but to all of the girls in attendance at the meeting. (A. Place Dep. 131:15-16, 132:16-18).

Second, Andrea's claim about Coach Way not talking to her or not giving her feedback was contradicted by Andrea's own testimony. Andrea testified that Coach Way would give her compliments and positive reinforcement but that changed over time as her playing time decreased about midway through the season. (A. Place Dep. 37:22-38:2, 106:10-12, 106:24-107:20, 109:6-17). She also testified that once she talked to Coach Way about her playing time, Coach Way stopped giving her any encouragement or constructive criticism. (A. Place Dep. 116:21-117:7). But she also admitted that Coach Way did not stop talking to her and was still giving her feedback at practices and games, including tell her when she did something wrong or what she needed to work on or what she had done well. (A. Place Dep. 146:22-147:1, 149:16-17, 197:10-198:24). Even the example she gave about Coach Way going around the locker room to give each girl feedback included Andrea. (A. Place Dep. 147:14-148:6). In that particular instance, Andrea's specific feedback was that she was not giving effort. (A. Place Dep. 147:14-148:6). Another time, Andrea admitted that Coach Way told her she was not taking enough charges. (A. Place Dep. 197:10-198:6). In other words, Coach Way was still giving Andrea feedback, but Andrea did not like the feedback. However, Andrea never expressed her concerns about this supposed "unfair treatment" to any of the coaches, including Coach Way, or to anyone else except her parents. (A. Place Dep. 133:4-23).

According to Andrea's Complaint, the initial complaint of "harassment" by Coach Way was made by her parents to the District on January 31, 2019.[6] (Compl. ¶¶ 4, 33). Both of Andrea's parents were present at that meeting, along with Steve Harold (the Athletic Director), Jeremy Grimm (the

---

[6] There were two other supposed complaints of "harassment" after this meeting; one was on June 17, 2019 regarding the Wall of Shame, and one was on November 3, 2020 after Andrea was cut. (Compl. ¶ 33). Both of these complaints are addressed in more detail below.

Warren High School Assistant Principal), and Ryan Lemley (the Warren High School Principal). (Compl. ¶ 4). This meeting was over an hour long, and Mr. Lemley recorded the meeting.[7] (Lemley Dep. 174:20-175:15). During the meeting, Eddie and Bree ("Bree") Place complained about Andrea's playing time. (Lemley Dep. 68:2-13). At the very beginning of the meeting, Eddie talked about Andrea's playing time, stating that she had worked her way up to starting but that she was now on the bench, and he was upset with her playing time. (Lemley Dep. 177:22-178:24). Although Eddie mentioned mistreatment and used the word "bullying" at the beginning of the meeting, he was asked what he meant by that, and it was clear that the complaint was about playing time.[8] (Lemley Dep. 68:11-19; Harold Dep. 123:18-124:2, 125:4-18, 221:14-25, 223:1-5). During the meeting, the specific explanations and examples given by Eddie and Bree were about playing time. (Lemley Dep. 76:10-11, 106:12-15). The context of the meeting was that Andrea was not getting the playing time her parents thought she deserved. (Lemley Dep. 140:1-4; Harold Dep. 133:5-11, 230:2-13). None of the examples they gave rose to the level of bullying or harassment.[9] (Lemley Dep. 78:8-12, 187:5-10; Harold Dep. 125:24-126:1, 305:15-17). And, perhaps most tellingly, Eddie himself admitted during the meeting—more than once—that their complaint was about playing time. (Lemley Dep. 68:17-19, 75:23-76:1, 78:8-15, 91:12-92:1, 139:10-140:4, 179:19-181:10; Harold Dep. 123:25-124:2, 221:21-25). At one point, Eddie specifically said that Andrea was not getting any playing time, and

---

[7] This meeting was recorded by Mr. Lemley, and the entire recording was manually filed with the Court on October 6, 2022. An Affidavit of Mr. Lemley authenticating this recording is attached as Exhibit B. During Mr. Lemley's deposition, any portions of the recording that were played included the start and end time for the snippet that was played.

[8] During the meeting, Eddie also stated that he thought it was bullying by Mr. Harold and gave an example of Mr. Harold not saying hi or talking to Andrea. (Lemley Dep. 74:19-75:16; Harold Dep. 121:6-24). That was addressed during the meeting, and Mr. Harold gave an explanation and apologized to Eddie. (Harold Dep. 123:10-17). Mr. Harold also gave an explanation during his deposition that in the particular instance Eddie was referring to, he was running to turn on exhaust fans in the gymnasium at a basketball game. (Harold Dep. 121:6-24, 123:10-17). Additionally, Andrea herself testified that she did not have any concerns with Mr. Harold during her sophomore year and that he did not stop talking to her that year. (A. Place Dep. 118:13-24). The first time she noticed any "distance" with Mr. Harold was during her junior year since she was not part of the athletic program, and she saw him less. (A. Place Dep. 120:5-24).

[9] None of the policies that Andrea cited in her Complaint and attached to her Complaint were applicable to this situation, and, even if they were, these complaints did not rise to the level of bullying or harassment as defined in those policies. Nevertheless, each time her parents complained, the issue was looked into and investigated.

"that's why we're here." (Lemley Dep. 180:20-181:10). Bree stated at one point that if a player does not get into the game, the player is going to feel disappointed and like she is getting picked on. (Lemley Dep. 183:4-15). When Mr. Lemley indicated that there may be different views on where Andrea was at talent-wise, Eddie and Bree never corrected him or told him they were not there about playing time or about her talent. (Lemley Dep. 183:16-184:10). Rather, they told him they wanted Andrea to be playing at least twenty minutes per game, that it would be difficult for them to accept an explanation that Andrea was not one of the best players, that they would not be done if the explanation for Andrea's playing time was that she was not one of the best players, and that they would take it to the next level if that was the explanation for her playing time. (Lemley Dep. 184:12-186:8). It was clear from the meeting that the Places would not have been complaining if Andrea was playing and starting more than she was.

After this meeting, Mr. Harold talked to Coach Way. (Harold Dep. 128:13-19, 226:11-18; Lemley Dep. 77:21-24). He specifically asked her about what she had been doing and what she had been saying to the players. (Harold Dep. 226:11-17). He also observed her and never heard or saw any mistreatment of players. (Harold Dep. 128:13-19, 129:20-130:15, 315:6-317:7). Additionally, nobody else complained to Mr. Harold about Coach Way or made allegations to him that Coach Way was mistreating the players, including the players. (Harold Dep. 128:20-23, 130:11-15, 226:17-18, 314:25-315:5). Not only has Mr. Harold not received complaints from other people who would have been around Coach Way during the games—like the scorebook keeper, game officials, parents, students, other people in the crowd, the assistant coaches, or the athletic trainer—but he has only received positive feedback about Coach Way from some of those people. (Harold Dep. 317:18-319:6). In short, three District administrators met with Eddie and Bree on January 31, 2019 for over an hour, listened to their complaint and made sure they understood the basis of the complaint, confirmed with Eddie and Bree that it was about playing time (which did not rise to the level of

bullying or harassment), and then Mr. Harold spoke with Coach Way after the meeting and continued to observe her.

### C. The Wall of Shame was not created or set up by Coach Way, which the District determined by investigating Eddie and Bree's complaint.

The second report of "harassment" by Eddie and Bree against Coach Way was in a June 17, 2019 email to Board member Debbie West. (Compl. ¶¶ 8-9, 33; Exh. B to Compl.). In that email, Eddie and Bree complained about a Wall of Shame that was displayed at the basketball banquet. (Compl. ¶¶ 8-9, 33; Exh. B to Compl.). The Places thought that Coach Way had posted the Wall of Shame, which they claimed was bullying by Coach Way. (Compl. ¶¶ 8-9, 33; Exh. B to Compl.).

That year, the basketball banquet was on March 2, 2019, soon after the basketball season ended. (A. Place Dep. 181:17-182:5, Way Dep. 30:9-11, 68:9-12; Harold Dep. 255:5-8; Newton Dep. 189:22-190:2). In years past, Coach Way planned the basketball banquet, and they held it in the school's cafeteria, but that year, a parent of one of the players planned and organized the banquet with the help of some other parents. (Way Dep. 29:7-25, 68:17-24). The parent who organized it also set up the decorations for the banquet. (Way Dep. 29:23-25). One of the displays the parent put up was a board of pictures of the girls on the team, and at the top of the board, it said "Wall of Shame." (A. Place Dep. 182:10-12, 183:1-15; Exh. B to Compl.). Andrea was pictured on the display dribbling a basketball. (A. Place Dep. 183:16-184:8). Coach Way saw the display when she arrived at the banquet but did not think the pictures were unflattering or unathletic. (Way Dep. 30:1-2, 30:16-31:1, 68:5-8). She noticed the girls on the team taking pictures of the display and laughing and talking about the pictures, but she did not look closely at the display at the banquet. (Way Dep. 31:12-17).

When the Places sent the email to Board member Debbie West on June 17, 2019—more than three months after the banquet at which it was posted and on the day of the Board meeting in which the Board was voting on coaches' contracts, including Coach Way's contract, for the following year—

Ms. West forwarded the email to Superintendent Kyle Newton.  (Harold Dep. 242:14-25, 255:5-14; Newton Dep. 101:25-102:24, 195:12-196:9).  Mr. Newton forwarded the email to Mr. Harold to have him look into and investigate the complaint, which Mr. Harold did.[10]  (Harold Dep. 242:14-17, 269:17-18, 305:24-306:1; Newton Dep. 102:7-14).  Mr. Harold first contacted Coach Way to ask her about the display, and she told him that the display was at their banquet and that the parent who put it together would know more about it.  (Way Dep. 65:25-66:16, 306:22-307:2; Harold Dep. 306:22-307:2).  Mr. Harold then contacted the parent who planned and set up the banquet, who admitted that she created the display.  (Way Dep. 66:15-16; Harold Dep. 269:7-21, 307:3-11).  In talking to both Coach Way and the parent, Mr. Harold determined that Coach Way did not post the Wall of Shame and had nothing to do with the display.  (Harold Dep. 243:5-7, 243:21-23).  The findings of the investigation were discussed at the Board meeting that evening, and Eddie was present at the meeting. (Harold Dep. 243:8-245:3; Newton Dep. 103:23-105:21, 194:4-21).  Again, upon receiving this complaint from Eddie and Bree, the District investigated the allegation, and in doing so, determined that Coach Way did not set up the banquet and was not involved in creating or displaying the Wall of Shame.

### D.  Andrea was unable to play after her knee injury on February 4, 2019 until sometime in early 2020, which meant she could not play on the team her junior year.

Andrea injured her knee during the February 4, 2019 basketball game, after which she was unable to play for the rest of that basketball season, although she did continue to sit on the bench with the team.  (Compl. ¶ 6; A. Place Dep. 50:4-51:4, 96:14-97:22; Way Dep. 76:4-18, 89:25-90:11). Andrea was permitted to remain on the team for the rest of her sophomore year because she was already a part of the team.  (Way Dep. 76:14-18).  Andrea had surgery on May 2, 2019 to repair her

---

[10] Other issues were noted in the email, but those issues had already been investigated and/or dealt with during the season, so the only new issue was the Wall of Shame.  (Harold Dep. 306:2-21; Newton Dep. 108:13-109:4, 191:6-193:23, 196:10-23).

ACL and continued "an intense physical therapy regiment…for nearly a year."[11] (Compl. ¶ 7; A. Place Dep. 200:6-14). After her surgery, her doctor told her she could not physically participate in basketball or conditioning. (A. Place Dep. 207:1-7). She was still injured and going through physical therapy during her junior year, and she was physically unable to try out for the team her junior year.[12] (A. Place Dep. 200:15-23, 211:9-18). Andrea was not a member of the Warren High School varsity girls' basketball team during her junior year, which was the 2019 to 2020 school year. (Way's Response to Request for Admission No. 2, attached as Exhibit C). She was not released to play basketball by her doctor until around the end of January, just before February 2020. (A. Place Dep. 200:24-202:16, 211:19-212:9). This was the very end of the school's basketball season. (A. Place Dep. 211:19-212:9; Way Dep. 75:5-14).

Andrea has two complaints about her junior year, during which she was injured and unable to play basketball.[13] She claims she was not able to participate as a mentor in the annual Summer Kids Basketball Camp in June of 2019[14], and she was not able to dress with the team and travel with the team on the bus to away games. (Compl. ¶¶ 11-14). Not all of the players helped with the Summer Kids Basketball Camp that summer. (Way's Response to Request for Admission Nos. 6-7, attached as Exhibit C). Regardless, Andrea was injured and physically unable to play.

Because Andrea was not on the team her junior year, she could not wear the team's travel gear, sit on the bench with the team during games, or ride on the bus to away games with the team since only members of the team could do those things. (Way Dep. 72:16-73:3). Andrea herself admitted that the travel gear was something the girls' basketball team wore and that people who were

---

[11] More specifically, due to her injury and subsequent surgery, Andrea was doing physical therapy three times a week, and then at the six month mark, she also started seeing a personal trainer for two to three days per week. (A. Place Dep. 212:10-213:23, 214:14-23).

[12] In other words, she was not a part of the team at any point during her junior year. (Way Dep. 76:19-77:3).

[13] She did not complain or report these issues to anyone during her junior year. (A. Place Dep. 268:24-269:8).

[14] The reference in the Complaint to June 2020 is incorrect. (Compl. ¶ 11; A. Place Dep. 202:17-203:5).

not on the team did not wear the travel gear.  (A. Place Dep. 217:1-21).  Andrea also admitted that people who were not on the girls' basketball team were not allowed to travel with the team on the buses to away games.  (A. Place Dep. 22:7-11).  Nobody prevented Andrea from going to the games, though, and she went to some of the games that season to watch the team play.  (A. Place Dep. 223:2-8).  Coach Way handled Andrea's injury just like she did any other player pursuant to her typical practice, which is that players who start the season on the team and get injured during the season are allowed to continue to be a part of the team and sit on the bench and travel.[15]  (Way Dep. 90:16-19).  This is why Andrea remained on the team to finish out her sophomore year but was not on the team at any point during her junior year.

### E. Coach Way could not attend Andrea's letter of intent signing ceremony on October 22, 2020 because of her work obligations, but other people from the District did.

Andrea also alleges that Coach Way was invited to attend Andrea's Letter of Intent signing ceremony for the University of Rio Grande, an NAIA Division II college in Ohio, but did not attend. (Compl. ¶¶ 17-18).  It is true that Coach Way did not attend the signing ceremony.  (Way Dep. 203:14-18).  She did not attend because it was during her workday, and she was at work that day.  (Way Dep. 203:19-22).  During her time as a coach for the Warren High School girls' varsity basketball game, Coach Way was only able to attend one letter of intent signing ceremony because she was a substitute teacher at the time and was not working that day.  (Way Dep. 203:23-204:3).  Although Coach Way was not able to attend Andrea's signing ceremony, other people from the District were present, including Mr. Harold, Mr. Grimm, and Mr. Lemley.  (A. Place Dep. 240:17-241:8).

### F. Andrea attended tryouts for the 2020 to 2021 season but did not make the Warren High School girls' varsity basketball team for several reasons, none of which had to do with her parents or the Places' complaints.

The last of Andrea's complaints is that she did not make the basketball team her senior year.

---

[15] There is no District policy that addresses this; it is up to the coaches to make these decisions.  (Newton Dep. 115:9-21).

(Compl. ¶ 19). On the last day of tryouts, which was November 3, 2020, Andrea was informed she did not make the team. (Compl. ¶ 19; Way Dep. 132:13-16). According to Andrea, she was told that there was not a role for her on the team, but she is not sure why she did not make the team. (A. Place Dep. 254:3-8, 254:25-255:5). From her perspective, she thought a spot on the team was owed to her because of the dedication and time and work she had put in. (A. Place Dep. 257:8-9). Despite thinking a spot was owed to her, Andrea herself recognizes that participation in athletics is recognized as a privilege—not a right—for students in Ohio. (Compl. ¶ 34; A. Place Dep. 265:17-20).

The decision to cut Andrea was a joint decision between Coach Way and the other coaches, including Chad Smith, Brad Venham, and Heather Saliba. (Way Dep. 132:18-21; Saliba Aff. ¶¶ 5-6, attached as Exhibit D). During tryouts, the coaches discussed Andrea's skill level, where she ranked amongst the other players, and where they saw her fitting on the team's lineup. (Way Dep. 132:24-133:4, 135:18-136:3, 196:8-197:10; Saliba Aff. ¶¶ 7-8). This is a normal part of their process during tryouts when they discuss fit and skill level. (Way Dep. 133:8-14; Saliba Aff. ¶¶ 6-7). They had her listed as the ninth player and the sixth guard. (Way Dep. 133:5-7). Based on where she fell in the team's lineup, she would not have received much playing time, which is hard for a senior player, and they could not find a role for her on the team. (Way Dep. 143:22-144:3, 196:25-197:10). Other players who ranked around Andrea's level were lower classmen and were kept for specific reasons when looking at their roles on the team. (Way Dep. 163:20-164:4, 172:25-173:14, 175:2-22). The coaches also discussed Andrea's attitude and coachability, which is something they had talked to Andrea about during her sophomore year on the team. (Way Dep. 133:16-135:13, 135:18-136:3; Saliba Aff. ¶ 9). All of the coaches agreed. (Way Dep. 136:8-17, 196:2-7; Saliba Aff. ¶ 11). Coach Way also asked for input from the senior captains. (Way Dep. 132:20-23). Coach Way asked for their feedback because this was an extremely tough decision, and she did not take it lightly. (Way Dep. 138:8-12, 141:5-11; Saliba Aff. ¶ 11). The coaches had talked about this decision at length.

(Way Dep. 141:11-13). The senior captains had played with Andrea since elementary school, so Coach Way respected their opinions and wanted to see if she was missing anything from a player's standpoint. (Way Dep. 138:8-21, 139:13-23, 141:13-22). None of them disagreed with the decision. (Way Dep. 138:23-139:12, 196:2-7).

Coach Way did not cut Andrea because of Andrea's or Eddie's complaints. (Way Dep. 154:15-17, 172:14-21). During the coaches' discussions, the coaches, including Coach Way, never discussed cutting Andrea because of Andrea, her parents, or their past complaints, nor was this a part of the decision. (Saliba Aff. ¶ 10). Nobody told Andrea that she was cut from the team because of her or her parents' complaints, and she has no evidence that she was cut because of her or her parents' complaints. (A. Place Dep. 258:20-259:5). Likewise, nobody has told Mr. Lemley, Mr. Newton, or Mr. Harold that Andrea did not make the basketball team her senior year because of the Places' complaints. (Lemley Dep. 188:21-189:6; Newton Dep. 204:19-205:10; Harold Dep. 299:12-300:15).

The Warren Local School District does not have a no cut policy or a policy that coaches cannot cut players. (Harold Dep. 293:12-16, 326:16-19). Cuts do happen in the District across multiple grade levels. (Harold Dep. 291:1-11, 293:17-21, 326:16-24). Andrea was not the first or only player that Coach Way cut from a team she was coaching. The same year that Andrea did not make the team, there were two other players who were trying out but stopped showing up to the tryouts. (Way Dep. 197:11-20). If they had continued, these two players would also have been cut. (Way Dep. 197:11-20, 212:16-24). Coach Way cut a senior basketball player (who, like Andrea, had played on the varsity team the year before) in 2011 while coaching with the Warren Local School District. (Way Dep. 142:2-12). Coach Way also cut players when she was an assistant coach for the Warren Local School District and when she coached basketball at other schools. (Way Dep. 197:21-198:19). She even cut players when she coached at the elementary school level. (Way Dep. 198:17-199:4). Coach

Way does not enjoy the process of making the decision to cut players from teams; that process is "awful" and "by far the worst part of the job…." (Way Dep. 199:5-11).

When Andrea did not make the team, Eddie called several people, including Mr. Lemley and Mr. Newton, to make his third and final complaint. (Compl. ¶¶ 22-23, 33; Lemley Dep. 145:10-146:18; Newton Dep. 116:17-117:6). Mr. Newton, Mr. Lemley, and Mr. Harold met the following morning. (Lemley Dep. 149:24-150:24; Newton Dep. 130:112-18, 136:3-24). Mr. Harold shared with them the explanation that Coach Way had given him as to why Andrea did not make the team. (Newton Dep. 154:9-155:1). Coach Way explained that Andrea did not make the team because of her ability on the court compared to the rest of the team and her grade level, her attitude/coachability, and the belief that she would not be accepting of her role on the team. (Newton Dep. 144:11-22, 160:23-18, 203:4-204:18; Harold Dep. 96:18-97:10, 291:13-19, 296:20-297:21). She had also explained to Mr. Harold that Andrea would have been the sixth guard on the team and the ninth or tenth player on the team. (Newton Dep. 163:1-6). At the end of the meeting with Mr. Newton and Mr. Harold, Mr. Lemley sent Eddie a text to tell him that Mr. Newton was taking it from there and that Eddie should reach out to Mr. Newton to discuss it further. (Lemley Dep. 147:2-7, 149:20-23, 152:24-153:7, 159:21-160:20, 161:3-11; Lemley Dep. Exh. F; Newton Dep. 129:15-131:23). Eddie never reached back out to Mr. Newton. (Lemley Dep. 161:16-19; Newton Dep. 200:1-21). Again, after Eddie called about Andrea getting cut, administrators met and gathered information and determined that Andrea was not cut because of any improper reason.

## III. LAW AND ARGUMENT

### A. Summary judgment standard

Summary judgment is proper "if…there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element

17

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

>   **B.  Andrea did not engage in protected speech, but even if she did, Defendants' actions were not motivated by her speech, so she cannot establish a First Amendment retaliation claim.**

To show retaliation under the First Amendment, a plaintiff must establish (1) that the First Amendment protects her speech, (2) that she suffered an injury that would deter a person of "ordinary firmness" from continuing to speak out, and (3) that the defendant's actions were motivated at least in part by the plaintiff's speech. *Kesterson v. Kent State Univ.*, 967 F.3d 519, 525 (6th Cir. 2020). If the plaintiff meets this burden, then the burden shifts to the defendant; if the defendant can show it would have taken the same action in the absence of the protected activity, then it is entitled to summary judgment. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 587 (6th Cir. 2008).

First, Andrea did not engage in protected speech. As an initial matter, the allegedly protected speech was her statements to her parents regarding Coach Way's alleged actions. (Compl. ¶ 47). These statements had to do with Coach Way's decisions about playing time and, to a lesser extent, Coach Way's communication (whether and how she was communicating with Andrea and other players on the team). *Supra* p. 5-11. This speech amounted only to a criticism of coaching decisions and methods, which is not protected speech. *Doe v. Alvey*, 2021 U.S. Dist. LEXIS 55674, *12-13, 15 (S.D. Ohio Feb. 2, 2021). The First Amendment rights of students are limited, and the Constitution does not compel school officials to surrender control of the American public school system to public school students. *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007). Student speech that is not school-sponsored or vulgar and obscene is governed by *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,

393 U.S. 503 (1969). *Id.* Pursuant to *Tinker*, school officials may regulate certain speech. *Lowery*, 497 F.3d at 588. Courts must consider the content and context of the speech and the nature of the school's response. *Id.* Protected student-athlete speech includes speech about race and sex discrimination and sexual assault. *Alvey*, 2021 U.S. Dist. LEXIS 55674, *9-10. "Conversely, student-athlete speech is not protected where the speech amounts to criticism of coaching decisions that is 'reasonably likely to cause substantial disruption' to the team."[16] *Id.* at *10 (citing *Lowery*, 497 F.3d at 594). Student-athlete complaints about coaching methods and decisions are not subject to judicial interference and therefore cannot form the basis of a First Amendment retaliation claim. *Id.*

Furthermore, it is "well-established that students do not have a constitutional right to participate in extracurricular activities." *Lowery*, 497 F.3d at 588. The Supreme Court has held that student athletes are subject to more restrictions than the student body at large due to the differing natures of the classroom and playing field. *Id.* at 589. "The immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal." *Id.* As the Sixth Circuit has recognized more than once, "'[u]nlike the classroom teacher whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline, [the role of the coach] is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount.'" *Id.* (internal citations omitted). Just like in *Lowery*, the issue in this case is not primarily about Andrea's right to express her opinions, but her alleged right to belong to the basketball team on her own terms. *See id.*

The claims in *Alvey* were very similar to the claims in this case. The plaintiff alleged she engaged in constitutionally protected speech when she complained about the coach's mistreatment and retaliatory conduct. *Alvey*, 2021 U.S. Dist. LEXIS 55674, *12. Despite the plaintiff's

---

[16] Under this standard, an actual disruption need not occur. *Lowery*, 497 F.3d at 593.

characterization of these complaints, the court noted that her complaints were based on things such as the coach's providing "little" coaching to the plaintiff, requiring her to collect balls and keep score, and preventing her from practicing and traveling with the team. *Id.* at *12-13. These complaints concerned "routine coaching decisions, such as playing time [and] practicing and traveling with the team…." *Id.* at *13. The plaintiff's speech amounted to "no more than criticisms of [the coach's] coaching decisions and methods, which [the coach] could reasonably have forecasted would disrupt the team." *Id.* at *13. The court found that the plaintiff's dismissal from the volleyball team based on those complaints did not violate the plaintiff's First Amendment rights, even where the plaintiff tried to argue that her reports were those of harassing, demeaning, and retaliatory behavior. *Id.* at *13, 15. As the court noted, "[n]ot all student-athlete complaints to or about a coach rise to the level of protected speech under the First Amendment." *Id.* at *15. In *Lowery*, the Sixth Circuit similarly found that a petition circulated by some players in which they stated they hated the head football coach and did not want to play for him was not protected speech under the First Amendment. 497 F.3d at 585-86, 588-89, 594, 600-01. Likewise, Andrea's complaints had to do with Coach Way's decisions about Andrea's playing time and, to a lesser extent, Coach Way's communication. *Supra* p. 5-11. Whether she describes this as harassment, mistreatment, bullying, or retaliation makes no difference. This speech amounted only to a criticism of coaching decisions and methods, which is not protected speech. *Alvey*, 2021 U.S. Dist. LEXIS 55674, *12-13, 15.

Even if Andrea's speech was protected, Defendants' actions were not motivated because of Andrea's complaints to her parents or her parents' complaints to the District. To be clear, the only alleged retaliation at issue in this case is that Andrea did not make the team at the conclusion of tryouts on November 3, 2020. (Compl. ¶ 49). Andrea claims she was cut in retaliation for her parents' complaints on January 31, 2019 and on June 17, 2019. (Compl. ¶¶ 33, 47). But Andrea has no evidence that she did not make the team for the 2020 to 2021 basketball season because of her parents'

20

complaints in January and June 2019.   (A. Place Dep. 254:3-8, 258:20-259:5).   Awareness of

protected activity, without more, does no create an inference of unlawful retaliation.  *Henley v.*

*Tullahoma City Sch. Sys.*, 84 Fed. Appx. 534, 541 (6th Cir. 2003).  Rather, to show that speech was

a motivating factor in the adverse action, a plaintiff must point to specific, nonconclusory allegations

reasonably linking her speech to the action.  *Id.*  Andrea cannot rely on timing to help her create an

inference since even a four month gap between the protected conduct and the adverse action, without

more, is too long to support a reasonable inference of causation.  *Id.* at 542.  Here, there was one year

and five months to one year and ten months between Andrea's parents' complaints to the District and

the tryouts during which she did not make the team.   Furthermore, Defendants have presented

evidence that Andrea was not cut from the team because of the complaints, such that the coaches

would have made the same decision in the absence of the complaints.  *Supra* p. 14-17.  Likewise, the

District[17] did not fail to investigate or take any action, as described in detail above.  *Supra* p. 5-12.

### C. There is no constitutionally protected right to participate in high school athletics, and Andrea cannot establish that Defendants engaged in conduct that shocks the conscience or that they were deliberately indifferent, such that her substantive due process claim also fails.

To state a claim for a substantive due process violation[18] under 42 U.S.C. 1983, a plaintiff

must establish (1) the deprivation of a right secured by the Constitution or laws of the United States

(2) that was caused by a person acting under the color of state law.  *Embassy Realty Invs., Inc. v. City*

*of Cleveland*, 572 Fed. Appx. 339, 343 (6th Cir. 2014).  The Sixth Circuit "'has recognized two types

of substantive due process violations: (1) official acts that are unreasonable and arbitrary and may not

take place no matter what procedural protections accompany them, and (2) official conduct that

---

[17] To the extent that this claim against the District is a *respondeat superior* claim, then the claim against the District also fails because there is no *respondeat superior* liability in actions under 42 U.S.C. 1983, and there is no evidence a government custom or policy led to any adverse action against Andrea.  *Jenkins*, 513 F.3d at 589.

[18] It is not clear which type of substantive due process violation Andrea is alleging given the conclusory manner in which she alleges this claim.  Andrea seems to be arguing that Defendants' alleged violation shocks the conscience but also appears to be arguing a state-created danger theory against the District.  (Compl. ¶¶ 54-57).  Both theories are addressed.

shocks the conscience.'" *Id.* (internal citation omitted). An action by a government official violates substantive due process "only when it 'can properly be characterized as arbitrary, or conscious shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (internal citation omitted). Only the "most egregious official conduct" can be said to be arbitrary. *Id.* at 846. The U.S. Supreme Court has rejected the "lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct" and has held that the "Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 848-49.

As the Sixth Circuit has held, there is no constitutionally protected right to participate in high school athletics. *Lowery*, 497 F.3d at 588, 597. Likewise, the District has no policy against cutting student athletes from teams. (Harold Dep. 293:12-16, 326:16-19). Cuts do happen in the District across multiple grade levels. (Harold Dep. 291:1-11, 293:17-21, 326:16-24). Andrea was not the first or only player that Coach Way cut from a team she was coaching. *Supra* p. 16-17. Moreover, Andrea did not make the basketball team her senior year for several reasons, none of which had to do with the Places' complaints. *Supra* p. 14-17. Upon receiving notification that Andrea had been cut, two administrators talked to Coach Way about the reasons Andrea did not make the team and met with the Superintendent the next morning to discuss the situation. *Supra* p. 17. They found the reasons were appropriate reasons to determine who made the team. (Newton Dep. 204:11-18).

The Complaint also appears to state a "state-created danger" claim against the District. (Compl. ¶¶ 56-57). Generally, the due process clause of the Fourteenth Amendment does not protect against private violence or impose affirmative duties of care on the government to protect against private violence. *Barefield v. Hillman*, 2021 U.S. App. LEXIS 21602, *4-5 (6th Cir. July 21, 2021). There are two exceptions to this rule, one of which is alleged in this case. *Id.* at *5. To state a claim under the state-created-danger doctrine, a plaintiff must show (1) an affirmative act by the state that

22

either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff. *Id.* at *6 (6th Cir. July 21, 2021).

As an initial matter, Andrea does not claim that a third party endangered her. (*See* Compl.). Rather, she alleges harm by the two named Defendants in this matter—the District and Coach Way. (Compl. ¶¶ 54-59). During the timeframe at issue in this case, Coach Way was not a third party or private actor; she was employed by the District in the position of the head varsity coach for the girls' basketball team. (Compl. ¶ 44). Therefore, the state-created-danger doctrine is inapplicable to this case. Even if it were applicable, Andrea cannot establish any of the three required elements.

Under the affirmative act element, the relevant question is whether the plaintiff was safer before state intervention than after it. *Id.* at *7-8. As described in detail above, the District—through its administrators—looked into and investigated both of the complaints made by Eddie and Bree in 2019. *Supra* p. 8-12. After the first complaint in January 2019, Mr. Harold, Coach Way's direct supervisor, talked to Coach Way and observed her at practices and games but never heard or saw any mistreatment of players. (Harold Dep. 128:13-19, 129:20-130:15, 226:11-18, 315:6-317:7; Lemley Dep. 77:21-24). After the second complaint in June 2019, Mr. Harold investigated the Wall of Shame and discovered that it was created by a parent, not by Coach Way. *Supra* p. 12-14. The District— through its administrators—looked into and investigated Eddie's third complaint when Andrea did not make the basketball team her senior year. *Supra* p. 14-17. There is no evidence, and Andrea does not claim, that she was safer before the District's intervention than after it. (*See* Compl.). Rather, she claims that the District failed to investigate or take appropriate action against Coach Way, but this was not the case. (Compl. ¶¶ 56-58). Likewise, there is no evidence, and Andrea does not claim, that there was a special danger to her wherein the District's actions placed her specifically at risk, as

23

distinguished from a risk that affects the public at large. (*See* Compl.). The alleged harm is presumably Andrea not making the team. But the District does not have a policy against cutting students, cuts do happen in the District, and Coach Way has cut other students. *Supra* p. 16-17.

Furthermore, the third element requires a sufficient level of culpability on the part of the defendant, which has been described as a "high bar." *Doe v. Jackson Local Sch. Dist. Bd. of Ed.*, 954 F.3d 925, 932-33 (6th Cir. 2020). This may be established by showing that the defendant engaged in conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" (which was discussed above) or, in certain circumstances, that the defendant was deliberately indifferent. *Id.* at 933. The deliberate indifference standard applies when officials have the opportunity for reflection and unhurried judgments. *Id.* The deliberate indifference standard has two parts. First, the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* Having drawn the inference, the official next must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights. *Id.* There are "demanding rules" for this standard:

> Start with the first part: To "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, a public official must know of more than a *general* risk of harm. The official must know of the *specific* risk that later develops….Turn to the second part: To act with "reckless or callous indifference," a public official must do more than be aware of "a substantial risk of serious harm." The official's response to that harm must also be "conscience shocking." And if the official chooses a response motivated by a "legitimate governmental purpose," this element will generally be absent.

*Id.* at 933-34 (internal citations omitted) (emphasis in original). For all of the reasons argued above, Andrea cannot meet this standard. *Supra* p. 22-24.

**D. Andrea cannot establish that she was treated differently from others similarly situated, and even if she could, there was a rational basis for Defendants' actions. Additionally, a class of one theory of equal protection does not apply in this case, so she cannot establish her equal protection claim.**

To assert a valid equal protection claim, a plaintiff "must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal citation omitted). The threshold element is disparate treatment, and once disparate treatment is shown, then the equal protection analysis to be applied is determined by the classification used by the government decision-makers. *Id.* Andrea's Complaint fails to make a "plausible allegation" that similarly situated individuals have not been subject to the same alleged treatment by Defendants. (*See* Compl.). In fact, she makes no claim of disparate treatment or any comparison to similarly situated individuals.[19] (*See* Compl.). In the absence of any such allegation of disparate treatment as compared to similarly situated individuals, the Complaint fails to state an equal protection claim. *Id.* at 379-80. And Defendants have explained the rational basis for Coach Way's decision. *Supra* p. 14-17.

Even if Andrea pled disparate treatment, her equal protection claim still fails. When a plaintiff does not allege the government's actions burden a fundamental right or target a suspect class, then the plaintiff is said to proceed on a so-called "class of one" theory. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006). To establish a "class of one" claim, a plaintiff must show that she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000). "Where a plaintiff succeeds in identifying similarly-situated individuals, the plaintiff must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will." *Benjamin v. Brachman*, 246 Fed. Appx. 905, 927 (6th Cir. 2007). The Supreme Court has held that "a class-of-one theory of

---

[19] She also admitted during her deposition that she is not aware of any other players who made complaints or whose parents made complaints about playing time or about Coach Way. (A. Place Dep. 277:17-278:16).

equal protection does not apply in the public employment context" because such "forms of state action…by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 598, 603 (2008). In *Heike v. Guevara*, the Sixth Circuit applied the same reasoning to a college basketball coach's decision to cut a player from the team, finding that such decisions are not actionable under a class-of-one theory of equal protection. 519 Fed. Appx. 911, 921-22 (6th Cir. 2013). The court specifically noted that "a coach's decisions about who plays, how much playing-time each player gets, and whether a player remains part of the team at the end of a season are, by their nature, 'based on a vast array of subjective, individualized assessments.'" *Id.* at 922 (quoting *Engquist*, 553 U.S. at 603). "These athlete evaluations are as or more inherently subjective than employment decisions." *Id.* "To subject run-of-the-mill coaching decisions to class-of-one equal-protection challenges would be to expose…athletics to an unprecedented, unjustified, and unjustifiable level of judicial oversight." *Id.*; *see also Kesterson*, 967 F.3d at 526. Thus, Andrea cannot pursue a class of one theory.

### E. There can be no claim for supervisor liability because Andrea did not name a supervisor in his or her individual capacity.

Supervisory liability "is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987); *see also McGrath v. Scott*, 250 F. Supp.2d 1218, 1222, 1223 (D.Ariz. 2003). In *Doe v. Claiborne County*, the Sixth Circuit held that a school board could not be held responsible for a teacher's sexual assault of a student because "the individual board members had no individual supervisory responsibilities other than those imposed on the School Board as a whole." 103 F.3d 495, 511-12 (6th Cir. 1996). In this case, there can be no claim for supervisor liability because Andrea did not name a supervisor in his or her individual capacity. (*See* Compl.). Andrea only named Coach Way and the Board of Education itself. (*See* Compl.). Additionally, as

argued above, Andrea cannot establish a constitutional violation, and the District did not fail to act. *Supra* p. 5-12, 14-17.  Rather, each time the administrators received a complaint from Eddie and Bree, they investigated it, which included talking to Coach Way each time.  *Supra* p. 5-12, 14-17.

**F.  Andrea has not identified an underlying constitutional violation or anything about the District's training or policies that is problematic, and she cannot rely on one alleged instance of a constitutional violation to establish *Monell* liability.**

A municipality can only be held liable under 42 U.S.C. 1983 "where the municipality *itself* causes the constitutional violation at issue."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658 (1978)) (emphasis in original). *Respondeat superior* or vicarious liability will not attach under 42 U.S.C. 1983.  *Id.*  Rather, municipal governments may be sued under 42 U.S.C. 1983 for unconstitutional or illegal municipal policies. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 819 (2007).  Additionally, where the established policies do not directly violate the Constitution, then municipalities may incur liability where they fail to adequately train their personnel such that a constitutional policy is applied in an unconstitutional manner.  *Id.*  In that situation, the plaintiff must show that the failure to train amounts to deliberate indifference to the rights of persons with whom the municipality's employees come into contact.  *Id.*  "In essence, the municipality must have exhibited deliberate indifference to 'known or obvious consequences,' and mere 'simple or even heightened negligence will not suffice' to render it liable."  *Id.* (internal citation omitted).  Here, Andrea alleges *Monell* liability against the District for its alleged failure to train its officials, coaches, and administrators in proper methods of recognizing, responding to, and preventing harassment and retaliation and in permitting ongoing harassment.  (Compl. ¶ 72).

As an initial matter, municipal liability requires an underlying violation of the plaintiff's constitutional rights, as well as a finding that the municipality was responsible for that violation. *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000).  Since no individual

can be found to have violated the Andrea's rights, as argued in detail above, then the District may not be held liable under *Monell*.

Additionally, to establish liability under a failure to train theory, the plaintiff must prove three distinct facts: that the training program is inadequate to the tasks that employees must perform; that the inadequacy is the result of the municipality's deliberate indifference; and that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities.'" *Id.* at 62. "A **pattern** of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (emphasis added); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 821-24 (1981). Put another way, a failure-to-train claim requires a plaintiff to plead (1) a clear and persistent pattern of illegal activity, (2) which the municipality knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the municipality's custom was the cause of the deprivation of her constitutional rights. *Briggs v. Hogan*, 2022 U.S. App. LEXIS 8783, *17 (6th Cir. Apr. 1, 2022). In *Briggs*, the Sixth Circuit affirmed the dismissal of the plaintiff's *Monell* claim where the Complaint alleged:

> As a direct result of the lack of training and supervision of Defendants Williams and Hogan and other act [sic] as described, Plaintiff was harmed in that he was innocent of the charges against him and was forced to defend against false criminal charges….Plaintiff is informed and therefore believes and therefore alleges that at the time of charges, arrest, and prosecution the COUNTY had failed to properly train[] Defendants Williams and Hogan….

*Id.* at *17-18. The court found that these "vague and conclusory allegations concerning [the defendant's] alleged lack of training are insufficient to state a claim because they fail to identify a

28

pattern of illegal activity to which [the defendant] was deliberately indifferent." *Id.* at *18. Likewise, Andrea has failed to identify a pattern of illegal activity to which the District was deliberately indifferent. (*See* Compl.). Rather, she has made "vague and conclusory allegations" concerning the District's supposed failure to properly train, which is insufficient to state a claim. (Compl. ¶ 72). This claim also ignores the fact that the District looked into each complaint by the Places. *Supra* p. 5-12, 14-17. The issue was not that the District's officials, coaches, and administrators were not properly trained but that the complaints were not actual complaints of harassment and retaliation. Therefore, there can be no *Monell* liability.

### G. Defendants are entitled to qualified immunity to Andrea's constitutional claims.

Even if Andrea could establish any of her constitutional claims, then Defendants would be entitled to qualified immunity. A two-part test is used to determine if a government official is entitled to qualified immunity. *Lowery*, 497 F.3d at 587. First, a court must determine if the official's conduct violated a constitutional right. *Id.* If that question is answered in the affirmative, then a court must determine if the right was clearly established at the time of the violation. *Id.* But, as the Sixth Circuit has held, there is no constitutionally protected right to participate in high school athletics. *Id.* at 588, 597. Therefore, Defendants are entitled qualified immunity on Andrea's constitutional claims.

### H. Andrea's claim of a violation of free speech under the Ohio Constitution is not a viable cause of action.

The Ohio Supreme Court has held that Section 11, Article I of the Ohio Constitution "does not set forth an accompanying cause of action for a violation of the right of free speech." *Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities*, 64 Ohio St.3d 252, 255 (Ohio 1992). Additionally, the Ohio General Assembly has not authorized such an action. *Id.* Therefore, this is not a viable cause of action.

### I. There is no cause of action under R.C. 2744.03(A)(6).

R.C. Chapter 2744 governs political subdivision immunity and liability. *See* R.C. 2744.01 *et seq.* Ohio courts use a three-tiered analysis to determine whether a political subdivision is entitled to immunity under R.C. Chapter 2744. *Greene Cty. Agricultural Soc. v. Liming*, 89 Ohio St.3d 551, 556–57, 733 N.E.2d 1141 (Ohio 2000); *Brady v. Bucyrus Police Dept.*, 194 Ohio App.3d 574, 2011-Ohio-2460, 957 N.E.2d 339, ¶ 44 (3rd Dist.). "Immunity is also extended to individual employees of political subdivisions." *Lambert v. Clancy*, 125 Ohio St.3d 231, 236, 2010-Ohio-1483, 927 N.E.2d 585, 590, ¶ 10 (Ohio). For claims against individual employees, the three-tiered analysis is not used. *Id.* Rather, R.C. 2744.03(A)(6) provides that an employee is personally immune from liability unless one of the following applies: (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon the employee by a section of the Revised Code. *Id.* In other words, R.C. 2744.03(A)(6) provides the exceptions to the immunity of employees of political subdivisions, not a separate cause of action for such behavior. Thus, this is not a viable cause of action.

### J. Defendants are immune from liability on Andrea's negligent supervision and retention and intentional infliction of emotional distress claims, and even if they are not, then Andrea still cannot establish the required elements of those claims.

Andrea also asserts a claim of negligent supervision and retention against the District and an intentional infliction of emotional distress claim against both Defendants. (Compl. ¶¶ 87-91, 93-95). Under R.C. 2744.02(A)(1), "[e]xcept as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Using the three-tiered analysis, a court must first determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with either a governmental or proprietary function. R.C. 2744.02(A)(1);

30

*Brady*, 2011-Ohio-2460, ¶ 44.  "The general rule is that political subdivisions are not liable in damages." *Brady*, 2011-Ohio-2460, ¶ 44.  If the entity is a political subdivision entitled to immunity, then the court must determine whether any of the exceptions enumerated in R.C. 2744.02(B) apply to remove the entity's immunity.  R.C. 2744.02(B); *Brady*, 2011-Ohio-2460, ¶ 44.  If any exception found in R.C. 2744.02(B) applies, then the entity can reinstate its immunity by asserting a defense found in R.C. 2744.03 that establishes non-liability.  R.C. 2744.03(A); *Brady*, 2011-Ohio-2460, ¶ 44.  However, if no exception under R.C. 2744.02(B) applies, then the entity retains its general grant of immunity, and the defenses under R.C. 2744.03 need no consideration.  *Brady*, 2011-Ohio-2460, ¶ 44.

The District is entitled to a general grant of immunity because it is a political subdivision. "'Political subdivision' or 'subdivision' means a municipal corporation,…**school district**, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." R.C. 2744.01(F) (emphasis added).  As Ohio's appellate courts have held, school boards are also political subdivisions under the statute, and the same immunity analysis applies for public schools and their school boards.  *See, e.g.*, *Bucey v. Carlisle*, 1st Dist. Hamilton No. C-090252, 2010-Ohio-2262, ¶ 6; *Horen v. Bd. of Educ. of Toledo Public Schools*, 6th Dist. Lucas No. L-09-1143, 2010-Ohio-3631, ¶ 34; *Hopkins v. Columbus Bd. of Educ.*, 10th Dist. Franklin No. 07AP-700, 2008-Ohio-1515, ¶ 17.

Further, the provision of a system of public education is a governmental function.  R.C. 2744.01(C)(2)(c); *Jones v. Delaware City School Dist. Bd. of Educ.*, 5th Dist. Delaware No. 2013 CAE 01 0009, 2013-Ohio-3907, ¶ 18.  The design, construction, reconstruction, renovation, repair, maintenance, and operation of any school athletic facility, school auditorium, or gymnasium or any recreational area or facility, including but not limited to a playfield or indoor recreational facility, is also a governmental function.  R.C. 2744.01(C)(2)(u).  The Ohio Supreme Court has specifically held that a teacher/baseball coach who was employed by a school district and who was acting within the scope of his employment was engaged in a governmental function.  *Elston v. Howland Local Schs.*, 113

31

Ohio St. 3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 10; *see also Perkins v. Columbus Bd. of Edn.*, 10th Dist. Franklin No. 13AP-803, 2014-Ohio-2783, ¶ 12 (holding that the provision of public education "extends to most school activities and administrative functions of the educational process, even if not directly comprising part of the classroom teaching process").  Because it is a political subdivision that engaged in a governmental function, the District is entitled to a general grant of immunity under R.C. 2744.02(A)(1), as is its employee, Coach Way.

Next, the District retains its immunity because none of the exceptions under R.C. 2744.02(B) apply.  Andrea's claims do not involve the negligent operation of a motor vehicle, do not constitute the negligent performance of a proprietary function[20], do not implicate the condition of streets or highways, and do not involve physical defects within or on the grounds of buildings that are used in connection with the performance of a governmental function.  R.C. 2744.02(B)(1)-(4).  And Andrea does claim that any section of the Ohio Revised Code expressly imposes civil liability on the District.  *See* R.C. 2744.02(B)(5).  Since no exceptions apply, the District retains its immunity to the negligent supervision and retention[21] and intentional infliction of emotional distress claims.[22]

Similarly, Coach Way is immune from liability for these claims.  As noted above, R.C. 2744.03(A)(6) provides that an employee is personally immune from liability unless one of the three exceptions under that provision apply.  Here, Coach Way's actions were not manifestly outside of the

---

[20] As previously noted, the function at issue in this case is a governmental function.  No exception exists for the alleged negligent performance of a *governmental function.  See* R.C. 2744.02(B)(1)–(5).

[21] Even if the District were not entitled to immunity on this claim, Andrea could not establish the necessary elements of the claim.  In order to establish a claim for negligent supervision or retention, the following elements must be demonstrated: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.  *Chapa v. Genpak, LLC*, 10th Dist. Franklin No. 12AP-466, 2014-Ohio-897, ¶ 106.  For all of the reasons noted above, Andrea cannot establish that Coach Way was incompetent or the District had knowledge of any such incompetence.  *Supra* p. 2-17.  Furthermore, she cannot establish any act or omission by the District that caused her injuries since, as noted above, the District investigated each of Andrea's complaints but found no issues.  *Supra* p. 5-12, 14-17.

[22] As the Ohio Supreme Court has held, there are no exceptions to immunity for the intentional tort of intentional infliction of emotional distress.  *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450, 452, 639 N.E.2d 105 (1994).  Ohio courts have consistently held that political subdivisions are immune under R.C. 2744.02 from intentional tort claims. *Zieber v. Heffelfinger*, 5th Dist. Richland No. 08CA0042, 2009-Ohio-1227, ¶ 27.

scope of her employment or official responsibilities, nor is there any Revised Code section that imposes civil liability on the Coach Way. This only leaves the exception under R.C. 2744.03(A)(6)(b): the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. *Lambert*, 2010-Ohio-1483, ¶ 10; R.C. 2744.03(A)(6). These are difficult standards to meet. The standard for showing malice or bad faith is a <u>high</u> one, and summary judgment is appropriate in instances where one's actions show that she did not intend to cause any harm, did not breach a known duty through an ulterior motive or ill will, and did not have a dishonest purpose. *Christie v. Violet Twp. Fire Dept.*, 5th Dist. Fairfield No. 09CA57, 2010-Ohio-2547, ¶ 14. "Bad faith" involves "a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.* at ¶ 12. The Ohio Supreme Court has defined "wanton misconduct" as "'the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'" *Argabrite v. Neer*, 149 Ohio. St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 8 (2016) (citation omitted). It has defined "reckless conduct" as "conduct 'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.'" *Id.* (citation omitted). These are "rigorous standards that will in most circumstances be difficult to establish…." *Id.* Where the record lacks evidence that the political subdivision employee acted in such a manner, the trial court should grant summary judgment. *Schoenfield v. Navarre*, 164 Ohio App.3d 571, 2005-Ohio-6407, 843 N.E.2d 234, ¶ 24 (6th Dist.).

Here, besides Andrea's conclusory statement in her Complaint, there is no such evidence in the record. (Compl. ¶ 84). Rather, as explained in detail above, Coach Way's decisions with regards to playing time and who made the team were appropriate. *Supra* p. 2-17. Therefore, Coach Way is also immune from liability for the intentional infliction of emotional distress claim. And even if

Coach Way was not immune, Andrea could not establish this claim, either.  To establish a claim of intentional infliction of emotional distress, a plaintiff must prove (1) that the defendants intended to cause the plaintiff severe emotional distress; (2) that the defendants' conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) that the defendants' actions were the proximate cause of the plaintiff's serious emotional distress; and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it.  *Phung v. Waste Mgmt.*, 71 Ohio St.3d 408, 410 (Ohio 1994); *Burkes v. Stidham*, 107 Ohio App.3d 363, 375, 668 N.E.2d 982 (8th Dist. 1995).  As the Ohio Supreme Court has held, "'[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 375 (1983) (abrogated on other grounds). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  *Id.*  Again, none of the allegations at issue in this case rise to such a level.  *Supra* p. 2-17. If they did, no high school coach would be able to make coaching decisions about playing time or who makes the team without facing an intentional infliction of emotional distress claim from players.

### K.  Andrea is not entitled to punitive damages and attorney's fees.

Andrea is precluded from recovering punitive damages and attorney's fees against the District and Coach Way.  Her request for punitive damages and attorney's fees against the District and Coach Way in her official capacity must be dismissed because punitive damages cannot be awarded against a political subdivision.  *City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981); *Hunsche v. City of Loveland*, 133 Ohio App.3d 535, 542 (1st Dist. 1999); *Hope Acad. Broadway Campus v. Integrated*

*Consulting & Mgmt.*, 8 Dist. Cuyahoga Nos. 96100 and 96101, 2011-Ohio-6622, ¶ 28; R.C. 2744.05. Further, the "American Rule" does not permit the prevailing party to recover attorney's fees in the absence of statutory authorization or an enforceable contract. *Shimman v. Union of Operating Eng'rs, Local 18*, 744 F.2d 1226, 1229 (6th Cir. 1984). Courts have also recognized a bad faith exception that allows attorney's fees in certain exceptional cases where the opposing party has acted in bad faith. *Id.* However, for all of the reasons argued above, all of Andrea's claims fail, such that she cannot be entitled to attorneys' fees. Second, Andrea's request for punitive damages and attorney's fees against Coach Way in her individual capacity must also be dismissed because she cannot establish "evil motive or intent" or reckless or callous indifference. *Biver v. Saginaw Twp. Community Schools*, 1986 U.S. App. LEXIS 32878, *27 (6 Cir. Oct. 27, 1986); *see also Preston v. Murty*, 32 Ohio St.3d 334, 334-36, 512 N.E.2d 1174 (Ohio 1987). Since punitive damages are assessed for punishment and not compensation, a "positive element of conscious wrongdoing is always required." *Preston*, 32 Ohio St.3d at 335-36; *see also Cabe v. Lunich*, 70 Ohio St. 3d 598, 602, 640 N.E.2d 159 (Ohio 1994) (stating that "'[t]his concept is reflected in the use of such terms as 'outrageous,' 'flagrant,' and 'criminal.' The concept requires a finding that the probability of harm occurring is great and that the harm will be substantial.'"). Here, Andrea has not made any claim of evil motive or intent, reckless or callous indifference, or actual malice. (*See* Compl.). But for all of the reasons stated above, Andrea cannot meet this burden. Additionally, for the same reasons she cannot recover attorneys' fees against the District, she cannot recover them against Coach Way.

## IV.    CONCLUSION

For all of the reasons argued above, all of Andrea's claims fail. Therefore, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,

/s/ Michael Valentine
Michael J. Valentine, Esq. (0038806)
Keona R. Padgett, Esq. (0090628)
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
(614) 228-1311; FAX (614) 232-2410
mvalentine@reminger.com
kpadgett@reminger.com
*Attorneys for Defendants* W*arren Local School*
*District Board of Education and Amy (Way)*
*Colgrove, individually and as Head Coach of*
*Girls' Basketball at Warren Local High School*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed on October 11, 2022, using the

Court's CM/ECF system and that service will be made upon the following via the Court's CM/ECF

system:

Mark A. Weiker, Esq. (0086413)
Morgan M. Masters, Esq. (0080858)
Albeit Weiker, L.L.P.
262 South 3rd Street
Columbus, Ohio 43215
(614) 745-2001; FAX: (614) 417-5081
mark@awlawohio.com
morgan@awlawohio.com
*Counsel for Plaintiff*

/s/ Michael Valentine
Michael J. Valentine, Esq. (0038806)
Keona R. Padgett, Esq. (0090628)